2007 OK CIV APP 12

**Bradley W. CLARK, Plaintiff/Appellee,**

**v.**

**STATE of Oklahoma ex rel. DEPART-
MENT OF PUBLIC SAFETY, De-
fendant/Appellant.**

**No. 101,831.**

Court of Civil Appeals of Oklahoma,
Division No. 4.

Jan. 9, 2007.

78 ■

Michael Gardner, Law Offices of Joe Farnan, Purcell, OK, for Appellee.

J. Kevin Behrens, April Deann Taylor, Department of Public Safety, Oklahoma City, OK, for Appellant.

Opinion on Rehearing by JOHN F. REIF, Judge.

¶ 1 This appeal concerns the constitutionality of a highway checkpoint with the purpose of verifying drivers' licenses and insurance. On March 23, 2003, Bradley Clark was stopped at a roadblock-type checkpoint and subsequently arrested for driving under the influence of an intoxicating beverage. Upon the findings made at Mr. Clark's implied consent hearing, the Department of Public Service (DPS) revoked his license. A trial de novo was held in the District Court of McClain County where the trial court set aside the revocation of Mr. Clark's license. DPS appeals that order.

¶ 2 At some time prior to Mr. Clark's arrest, State Trooper John Clay Anderson had become aware that several people near the area of Purcell were driving without valid drivers' licenses. In response to this information, Trooper Anderson decided to set up a roadblock-type checkpoint for the purpose of verifying drivers' licenses and insurance. Before doing so, he obtained permission from his supervisor and enlisted the help of Purcell Police Officer Joseph Burnett. The checkpoint was set up at the intersection of State Highway 74 and U.S. 77, which Trooper Anderson considered to be the safest location because it was well lit. The record indicates that every vehicle was stopped and each driver was asked to produce a valid license and insurance verification. The checkpoint was active between the hours of 2:00 a.m. and 3:00 a.m., during which time the officers kept their emergency lights on, and each vehicle was released within two to three minutes if the driver's license and insurance were proper.

¶ 3 At approximately 2:20 a.m., Mr. Clark, who was 20 years old at the time, was stopped at the checkpoint. When Officer Burnett approached Mr. Clark's vehicle, the officer observed him to have bloodshot eyes, thick, slurred speech, and an odor of an intoxicating beverage from his breath and person. The officer could also see a can of beer spilling onto the passenger floorboard. Mr. Clark admitted to having consumed six beers, and when asked to get out of his vehicle, he walked from side to side and

would sway forward and back while standing. Also, Mr. Clark was not able to produce a valid driver's license. Officer Burnett arrested Mr. Clark, informed him of Oklahoma's implied consent information, and administered a breath test, which resulted in a blood-alcohol level of 0.15 at 3:00 a.m. Pursuant to the arrest, DPS revoked Mr. Clark's driver's license.

¶ 4 At trial, over hearsay objection by Mr. Clark, the court allowed DPS to introduce into the record the "Log of Tests and Maintenance Record" for the breathalyzer used by Officer Burnett in administering the blood-alcohol test. Officer Burnett testified that he used the information contained in the log to verify that the breathalyzer machine had been properly maintained before administering the test. The log contained the name and permit number of the officer responsible for the maintenance of the breathalyzer, and it indicated the latest date when maintenance had been performed was February 25, 2003.

¶ 5 Once DPS presented its case, Mr. Clark demurred to the evidence, arguing that the revocation of his license should be set aside on two grounds. The first ground alleged the checkpoint was unconstitutional and the arrest or any evidence arising out of it was therefore invalid. The second ground alleged DPS failed to prove compliance with the Rules of the Board of Tests for Alcohol and Drug Influence, and therefore the results of the test administered to Mr. Clark were invalid. After hearing the evidence presented at trial, the trial court ruled for Mr. Clark on several grounds "set out in argument of . . . counsel—both as a matter of law and evidentiary discrepancies," and set aside the revocation of his driver's license.

¶ 6 On appeal, the crux of DPS's argument against setting aside the revocation of Mr. Clark's license is that the checkpoint was not unconstitutional, thus the arrest was valid, and the revocation of Mr. Clark's driver's license should therefore stand. In response, Mr. Clark contends that there are three grounds to consider the checkpoint in this case unconstitutional, under any of which his license should not be revoked. First, he argues the checkpoint was set up for an improper purpose under *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Second, he argues the checkpoint fails all three tiers of the reasonableness test established in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), due to DPS's failure to demonstrate an adequate public interest and for lack of effectiveness in promoting that interest. Third, Mr. Clark contends that the checkpoint was invalid without the introduction of departmental guidelines. He further maintains that, even · if the checkpoint was not unconstitutional, his license should not be revoked due to the failure of DPS to prove that the maintenance of the breathalyzer machine used to administer the blood-alcohol test was performed by a person possessing a valid permit under the Rules of the Board of Tests for Alcohol and Drug Influence. For the reasons that follow, we are unpersuaded by Mr. Clark's propositions and find merit to the propositions of DPS.

## I.

¶ 7 As to the constitutionality of the checkpoint, Mr. Clark's first argument relies heavily on *City of Indianapolis,* under which he argues that the checkpoint cannot be constitutional when employed for an improper purpose. *City of Indianapolis* involved a police department's use of vehicle checkpoints for the primary purpose of interdicting illegal narcotics. The issue before the Court was whether the checkpoints violated the Fourth Amendment's guarantee against unreasonable seizures. *Id.* at 34, 121 S.Ct. at 450. The Court held that, because the primary purpose of the Indianapolis narcotics checkpoint program was "indistinguishable from the general interest in crime control," the checkpoints violated the Fourth Amendment. *Id.* at 48, 121 S.Ct. at 458.

¶ 8 In its reasoning, the Court noted that it had never approved a checkpoint program whose primary purpose was to detect evidence of ordinary wrongdoing, and each program that had been approved was "designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety." *Id.* at 41, 121 S.Ct. at 454.

¶ 9 In *City of Indianapolis,* the Court struck down the checkpoints because the program's primary purpose was to interdict illegal narcotics, which involved a general interest in crime control. In the present case, however, we are not dealing with a drug interdiction program, but with a checkpoint set up for the primary purpose of verifying that motorists possess valid licenses and registration—a purpose that can be accurately categorized as ensuring roadway safety. Accordingly, we find that DPS presented competent evidence that proved the officers set up a checkpoint whose primary purpose is distinct from the general interest in crime control. Thus, we find the checkpoint in this case was for a legitimate purpose under *City of Indianapolis* and does not violate the Fourth Amendment.

■ ¶ 10 Second, Mr. Clark contends that the checkpoint in this case fails the well-established test for determining the reasonableness of a warrantless seizure articulated by the Court in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). In *Brown,* the Court's central concern was assuring that an individual's reasonable expectation of privacy is not subject to arbitrary invasion by law enforcement officers. 443 U.S. at 51, 99 S.Ct. at 2640. In striking a balance between the public interest and the individual's reasonable expectation of privacy, the *Brown* case provides that courts must weigh "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 50–51, 99 S.Ct. at 2640 (citation omitted).

¶ 11 In *Michigan v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481 (1990), the Court applied the *Brown* test in upholding the constitutionality of a sobriety checkpoint program conducted by the Michigan State Police. In *Sitz,* the sole issue was whether the initial stop of each motorist and the associated questioning and observation by checkpoint officers violated the Fourth Amendment. 496 U.S. at 450–51, 110 S.Ct. at 2485. In striking a balance between the competing interests, the Court held that the Michigan sobriety checkpoint program was consistent with the Fourth Amendment. *Id.* at 455, 110 S.Ct. at 2488.

¶ 12 In that decision, the director of the Michigan State Police appointed a sobriety checkpoint advisory committee to create guidelines setting forth procedures governing checkpoint operations, site selection, and publicity. Under the guidelines, all vehicles passing through the checkpoint would be stopped and their drivers briefly examined for signs of intoxication. If the checkpoint officer detected signs of intoxication, the motorist would be directed to a location out of the flow of traffic where an officer would check the motorist's driver's license and car registration and, if warranted, the officer would conduct further sobriety tests. If the field tests and the officer's observations suggested the driver was intoxicated, an arrest would be made. All other drivers would be permitted to resume their journey immediately.

¶ 13 At the time of the decision in *Sitz,* only one checkpoint had been operated under the program. During its 75–minute duration, two out of the 126 vehicles stopped at the checkpoint were arrested for driving under the influence of alcohol. The average delay for each vehicle was 25 seconds on average.

¶ 14 In applying *Brown* to the situation in *Sitz,* the Court found that the first factor of the test was satisfied due to the States' grave interest in eradicating drunken driving. *Sitz,* 496 U.S. at 451, 110 S.Ct. at 2485–86. The Court also determined that the Michigan checkpoint program effectively furthered that interest where the checkpoint resulted in the arrests of two drunk drivers out of the 126 drivers stopped. *Id.* at 454, 110 S.Ct. at 2487.

¶ 15 In evaluating the third factor of the *Brown* test, the Court weighed the "objective" and "subjective" intrusion on motorists who were briefly stopped at the checkpoint. The Court considered the objective intrusion on motorists to be minimal due to the brief duration of the seizures and the limited scope of the officers' investigation. *Sitz,* 496 U.S. at 451–52, 110 S.Ct. at 2486. The subjective intrusion on motorists was found to be reasonable where the checkpoint was selected

pursuant to guidelines, and uniformed police officers stopped every approaching vehicle. *Id.* at 453, 110 S.Ct. 2481. Thus, the Court found the degree of interference with individual motorists stopped at the checkpoint was "slight." *Id.* at 451, 110 S.Ct. at 2486.

¶ 16 In *Sitz,* the checkpoint served the state's indisputable interest in deterring drunk driving. Similarly, no one can seriously doubt the magnitude of Oklahoma's interest in assuring highway safety. As the Court acknowledged in *Delaware v. Prouse,* "States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles." 440 U.S. 648, 658, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979). In considering the public interest, the Court in *Sitz* found the checkpoint satisfied the second factor of the *Brown* test where two out of the 126 motorists stopped were arrested for driving under the influence. Likewise, the effectiveness of the checkpoint at use in this case is hardly refutable where Mr. Clark himself was unable to produce a valid driver's license when questioned by Officer Burnett.

¶ 17 The manner in which the checkpoint was conducted in the instant case closely resembles the checkpoint in *Sitz.* For example, in *Sitz,* uniformed officers stopped every approaching vehicle and conducted a brief investigation to detect signs of intoxication. In the instant case, each vehicle was stopped, the officers were in uniform, and their emergency lights were activated throughout the duration of the checkpoint's operation, so as to make their authority plainly visible. In *Sitz,* each motorist was delayed an average of 25 seconds, unless the officer detected signs of intoxication. In the present case, the delay was likewise minimal (one to two minutes), and the officer's questions were limited to whether the individual possessed valid license and registration, unless signs of criminal activity pressed them to act. Thus, we find that the overall intrusion on individual liberty was reasonable under the *Brown* test.

¶ 18 In conjunction with the third factor of the *Brown* test, Mr. Clark contends that the checkpoint was invalid without the introduction of departmental guidelines comparable to those required in impoundment cases.

We find dispositive the case of *Crowell v. State,* 2000 OK CR 3, ¶ 5, 994 P.2d 788, 790, wherein the court found there is no requirement that the State conduct a roadblock or checkpoint according to a specified, written plan in order for it to be constitutionally valid.

¶ 19 Thus, in evaluating applicable constitutional safeguards, we find that the checkpoint at issue in the present case does not violate the Fourth Amendment, and Mr. Clark's arrest for activities not related to the checkpoint's original intent was therefore valid.

## II.

¶ 20 As concerns the admissibility of the breathalyzer test, Mr. Clark refers us to *Westerman v. State,* 1974 OK CR 151, 525 P.2d 1359, in which the Oklahoma Court of Criminal Appeals held that the State must prove that the rules promulgated by the Board of Tests for Alcohol and Drug Influence have been complied with prior to the admission of the results of a breathalyzer test. Mr. Clark contends this was not done with regard to the periodic maintenance required under the Rules of the Board of Tests for Alcohol and Drug Influence. In particular, Mr. Clark contends DPS failed to show compliance with OAC 40:30–1–3(e), which provides, in pertinent part:

> Maintenance shall be performed as follows on the above listed equipment at least once during each thirty (30) day period and not later than thirty (30) days since the last prior such maintenance, or after the testing of twenty-five (25) subjects, whichever occurs first, by a person possessing a valid Breath Alcohol Analysis (Specialist) permit issued [The Board of Tests]:
>
> . . . .
>
> (3) The administrative maintenance performed, shall include; results of said verification analyses, date of inspection, and a written record of the inspection will be entered in the applicable portions of the Intoxilyzer 5000–D Log of Tests and Maintenance Record. . . .

¶ 21 After examining a copy of the logbook which was admitted into evidence at trial, we

note that it indicates the maintenance complied with the rules promulgated by the Board of Tests for Alcohol and Drug Influence pursuant to 47 O.S. Supp.2002 § 759. The log contained the name and permit number of the officer responsible for the maintenance of the breathalyzer, and it showed that the required maintenance had been performed within 30 days of Mr. Clark's arrest.

¶ 22 We further note that Mr. Clark does not contest the accuracy of the notations, nor does he contend that the maintenance officer identified by the log was not qualified to perform the maintenance task. He argues only that the testimony at trial was insufficient to prove the required maintenance. As we agree that the trial testimony alone falls short of proving full compliance with the Rules of the Board of Tests, we understand Mr. Clark to seek reconsideration of his hearsay objection to admitting the maintenance logbook into evidence. We find this proposition unavailing.

¶ 23 The Oklahoma Evidence Code enumerates several exceptions to the rule that hearsay is not admissible at trial. Among them is the official records exception, embodied under 12 O.S. Supp.2002 § 2803, which provides, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

8. To the extent not otherwise provided in this paragraph, a record of a public office or agency setting forth its regularly conducted and regularly recorded activities or matters observed pursuant to duty imposed by law and as to which there was a duty to report.

¶ 24 This statutory exception to the hearsay rule exemplifies the well-recognized judicial principle that "a record of primary facts made by a public officer in the performance of official duty is or may be competent prima facie evidence of the existence of such primary facts." *Hadley v. Ross*, 1944 OK 366, ¶ 16, 154 P.2d 939, 941. The exception is predicated on the presumption that public officials perform their duties effectively and impartially, and that it would be imprudent

to require all public officials to appear in court as witnesses. Thus, its purpose is to dispense with requiring those officials to repeatedly appear in court to prove routine matters. As stated in *Hadley*, 1944 OK 366, ¶ 18, 154 P.2d at 941–42:

Obviously it would be extremely difficult, if not impossible, to bring to court as witnesses all those public officials or deputies who have personal knowledge of the relevant and material facts sought to be proved by records kept by them. The exception to the hearsay rule in this regard is justified because of convenience and necessity, in view of the fact that it is well recognized that officials perform their duties under oath without prejudice and bias, impelled only by official responsibility and duty. It must also be presumed that their duties are performed efficiently and accurately; their records are therefore considered trustworthy.

¶ 25 However, this exception is not without qualification. When, under the general rules of evidence other than hearsay, the evidence shown through public records would not be competent if those who made the records were present and testifying, this exception does not make that evidence admissible purely because it is found in a public record. *Id.*, at ¶ 18, 154 P.2d at 942.

¶ 26 In the matter before us, a state officer performed certain maintenance pursuant to his duties as a public official and recorded this fact in a record required to be kept by law. The fact that the officer who made the record may have been available to testify, although he did not, does not belie the trustworthiness of the notations therein. Also, we find nothing in the record to indicate that the officer's testimony would not have been admissible had he been present. Furthermore, we believe the routine nature of these activities is consistent with the activities described under 12 O.S.2001 § 2803(8). In short, we find no reason to doubt the reliability of the log or the notations contained therein.

¶ 27 We find that the logbook in the present case was admissible pursuant to § 2803(8). The entries in the logbook, along with the testimony at trial, indicate the maintenance was performed as required under

*Westerman.* Therefore, we find that DPS has sufficiently proven compliance with the Rules of the Board of Tests of Alcohol and Drug Influence for admission of the breathalyzer test.

### III.

¶ 28 Based on the foregoing, we find that the revocation of Mr. Clark's license should not have been set aside. JUDGMENT SUSTAINING LICENSEE'S DEMURRER TO THE STATE'S EVIDENCE REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS.

RAPP, V.C.J., and GABBARD, P.J., concur.