**UNITED STATES of America**

v.

**Tyshaun BULLOCK Defendant.**

**No. CR. 02–010(TPJ).**

United States District Court, District of Columbia.

Aug. 20, 2002.

Charles Joseph Harkins, Jr., Kathleen M. Konopka, U.S. Attorney's Office, Washington, DC, for U.S.

Michelle M. Peterson, David Walker Bos, Federal Public Defender for D.C., Washington, DC, for Tyshaun Bullock.

### MEMORANDUM AND ORDER

JACKSON, District Judge.

Tyshaun Bullock was arrested about 5:00 o'clock on the evening of December 20, 2001, after plain clothes officers of the Fifth District Vice Squad, Metropolitan Police Department ("MPD"), found a substantial quantity of crack cocaine under the back seat of his automobile following a traffic stop on West Virginia Avenue, N.E., in Washington, D.C. Bullock has moved to

suppress the contraband as the product of an illegal search and seizure.

On the basis of testimony taken July 9–10, 2002, and permissible inferences drawn therefrom, the Court finds the circumstances of Bullock's arrest to be essentially as set forth below.

## I.

The vice officers were traveling in two unmarked cruisers—three to a car—wearing blue MPD "jump-out" jackets. They were proceeding eastbound on Mt. Olivet Road toward the controlled intersection with West Virginia Avenue when defendant Bullock, alone in his own vehicle, turned onto Mt. Olivet Road ahead of them from a side street a half block from the intersection. As Bullock and the cruisers approached the intersection the light was green. Traffic ahead of Bullock entered the intersection and turned left onto West Virginia Avenue heading northbound. Officer Witkowski, driving the lead cruiser, and his partner, front seat passenger Officer Allen, observed Bullock's vehicle, immediately ahead of them, enter the intersection at or about the moment the traffic signal turned yellow. Bullock paused in the intersection briefly to allow two other vehicles traveling in the opposite direction on Mt. Olivet Road to cross and clear the intersection. After the light had turned red, Bullock completed a left turn to proceed northbound on West Virginia Avenue. Officer Witkowski's cruiser followed him into the intersection on a red light in pursuit, activating first its siren and then the bubble light, with the second cruiser close behind.

Although another car had inserted itself between the lead cruiser and Bullock's car, Bullock quickly became aware of his pursuers and the fact that he was the one pursued, and promptly pulled to a stop on the right side of West Virginia Avenue approximately a third of a mile north of the Mt. Olivet Road intersection. Officer Witkowski pulled in behind him, and the second cruiser stopped behind Witkowski.

Officer Witkowski got out and approached the driver's side of Bullock's vehicle on foot. Officer Allen approached from the opposite side. Both officers observed Bullock moving "side to side" and "bending slightly forward to his [right] side." Witkowski did not ask for a license and registration. His first utterance to Bullock was an order to stop his car, and then to get out and walk to the rear. Officer Witkowski patted him down, finding nothing suspicious. He asked Bullock if he had a weapon or drugs on his person. Bullock said he did not. Witkowski then "passed" Bullock back to Officer Reynolds (the third officer in Witkowski's cruiser) standing to his rear. Officer Reynolds asked the same question to which, according to Officer Witkowski, Bullock not only responded in the negative, but also followed it with an invitation to search him if he wished. Officer Reynolds also found nothing.

Officer Allen, in the meantime, had circled around the front of Bullock's car. Facing Bullock, he asked if there were drugs or weapons in the car. Again, according to both officers, Bullock replied that there were neither drugs or weapons in the car and volunteered permission to search.[1] Officer Allen did so.

No contraband was observed by Officer Allen upon his visual inspection of the interior of Bullock's car. Without further encouragement Allen then began a search of the hidden spaces within, and in due course, upon lifting the back seat off the

---

1. In both instances, in response to the officers' inquiries about drugs or weapons, Bullock's exact words are supposed to have been, "No. You can search [me/it]." (Tr. of 7/10/02, p. 25; Tr. of 7/9/02, p. 32).

floor, discovered the drugs for which Bullock now stands charged. Bullock also received a traffic citation for running a red light.[2]

Bullock's account of the encounter is altogether different. He relates an afternoon of driving about in quest of an "alarm" system for his car, and multiple breakdowns, following one of which he became convinced he was under surveillance by these vice officers, culminating in the traffic stop. He was, he says, ordered (with profanity) from his vehicle at gunpoint and thoroughly searched, not "patted down," at the scene. At no time, however, did he consent to a search of his person or his car.

The Court credits only two aspects of Bullock's story: he lawfully entered the intersection on a green light or as it turned yellow with no opportunity to stop safely—he was beyond the stop line and Witkowski's cruiser was right behind him—and he gave no true permission, much less an invitation, for a search of either his person or his automobile.

## II.

Both officers who testified at the suppression hearing denied any prior knowledge of Bullock or having taken any notice of him that day until his vehicle pulled onto Mt. Olivet Road in front of their cruiser. (Tr. of 7/9/02, pp. 40–44; Tr. of 7/10/02, pp. 18–19). Nevertheless, it is clear to the Court that from the moment he caught their attention Bullock was suspected of criminal activity of the sort likely to be of interest to these vice officers, and that he would be the subject of at least a

*Terry*-type stop for further investigation. Enforcement of the traffic regulations of the District of Columbia was never their purpose.[3] The government contends, however, that the traffic stop they effected on West Virginia Avenue was, albeit a pretext, one they were lawfully entitled to employ to that end under *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

These officers have gone *Whren* one better. Not only was their subjective intent at all times to stop and search Bullock and his car, the Court concludes they had no probable cause to stop him for a traffic infraction and they knew it. They cited him for running a *red* light—not a yellow—and would probably have continued to insist that he had done so had it not been discovered that the watchdog camera at the intersection of Mt. Olivet and West Virginia had caught no picture of Bullock entering the intersection on a red light. The officers now recall that it was a *yellow* light Bullock disobeyed, but he clearly did not. The pertinent traffic regulation obliges a driver to stop (if he can do so safely) before reaching the crosswalk: even by the officers' account Bullock was beyond the stop line and moving through the crosswalk into the intersection when the light turned yellow. (Tr. of 7/10/02, p. 56).

Officer Allen was unfamiliar with the D.C. traffic regulation governing the entering of an intersection on a yellow light. (Tr. of 7/9/02, pp. 45–46). In fact, the regulation requires a driver confronted by a "steady yellow light" to stop *before entering the crosswalk* "unless so close to the

---

2. The intersection is equipped with a camera synchronized with the traffic signal that automatically photographs vehicles that cross the intersection stop line after the light turns red. No photograph was taken of Bullock's vehicle on December 20, 2001. (Tr. of 7/10/02, pp. 64–66).

3. Plain clothes officers in unmarked cars are, as a rule, prohibited by a standing MPD General Order from enforcing a traffic regulation unless the violation is so grave as to pose an immediate threat to the safety of others. (Tr. of 7/10/02, p. 62).

intersection that a stop cannot safely be made." 18 D.C. Mun. Reg. § 2103.5(b). Once in the intersection, as Bullock clearly was for practical purposes when the light turned yellow, before making a left turn he was obliged to "yield the right-of-way to other vehicles ... lawfully within the intersection." *Id.*, § 2103.3(b). It was rush hour. More than one oncoming vehicle had to clear the intersection before Bullock could complete his turn, an interval of approximately "five or ten seconds." (Tr. of 7/10/02, pp. 36–37). By then, of course, the light was red.[4]

■ The conclusion the Court draws is that Bullock committed no traffic violation witnessed by the Fifth District vice officers on December 20, 2001, and that the traffic stop—a pretext for an investigatory stop under *Whren*—was itself a pretext. In short, they had no objective probable cause to stop, let alone search, Bullock and his car for a traffic offense.

The Fifth District vice officers also expressly disavowed any knowledge of Bullock or his whereabouts on the afternoon of December 20, 2001. By their own admission they were altogether unaware of him until his car appeared on the road ahead of them a short distance from the intersection they were approaching. Thus they also had no articulated and reasonable suspicion of other criminal activity—at least none that they articulated at the hearing— that either Bullock's vehicle or its sole occupant were in any way engaged in some other violation of law and thus subject to the seizure of a traffic stop. *See Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

Finally, this record does not support a finding that any other permissible basis has been shown to justify the seizure of

Bullock and the search of his automobile on December 20, 2001. At best, Bullock was stopped indiscriminately solely in the interest of uncovering evidence of ordinary criminal wrongdoing, and thus in contravention of the Fourth Amendment. *See Indianapolis v. Edmond*, 531 U.S. 32, 42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

■ The search of Bullock's automobile was likewise unlawful absent his valid consent, since the pat-down of his person had revealed no contraband. *See Knowles v. Iowa*, 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). The government concedes as much. (Tr. of 7/9/02, p. 15). As the Supreme Court has stated, the validity of a so-called consensual search depends on an assessment of the totality of all the surrounding circumstances, and one assuredly relevant circumstance is whether the defendant knew he had the right to refuse consent to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Bullock is thoroughly conversant with his Fourth and Fifth Amendment rights—he has been through "traffic stops" before (Tr. of 7/9/02, pp. 88–89)—and Bullock denies ever giving consent to any of the officers to search at all (*Id.*, p. 108, pp. 127–28). He asserts that he did not protest either the search of his person or his car because he has learned through experience not to "escalate" the problem. (*Id.*, p. 107). Even after the pat-down Bullock was not free to leave (Tr. of 7/10/02, p. 60), and he knew it.

The Court concludes that whatever responses Bullock may have made to the queries put to him by Officers Witkowski and Allen, if any, they did not include a wholly gratuitous invitation to conduct a search, as both officers testified. The Court is reinforced in its conclusion that

---

4. The duration of the yellow caution signal at the intersection is approximately 3.8 seconds.

(Tr. of 7/10/02, p. 8).

Bullock did not consent to a search of his car by Officer Allen's candid acknowledgment that he was determined to search Bullock's car, with or without permission (Tr. of 7/9/02, p. 82), and that is what he did. The search was thus unreasonable under the current Fourth Amendment jurisprudence, and evidence of the drugs recovered by Officer Allen in the course thereof must be suppressed.

It is, therefore, this 20th day of August, 2002,

ORDERED, that defendant's motion to suppress [10] is granted, and evidence of the drugs seized from Bullock on December 20, 2001, and any statements he made subsequent thereto, are inadmissible at trial.