Justice Stevens,
with whom
Justice Souter and Justice Breyer join, dissenting.
Our prior cases have consistently assumed that the Fourth Amendment provides some degree of protection for probationers and parolees. The protection is not as robust as that afforded to ordinary citizens; we have held that probationers’ lowered expectation of privacy may justify their warrantless search upon reasonable suspicion of wrongdoing, see United States v. Knights, 534 U. S. 112 (2001). We have also recognized that the supervisory responsibilities of probation officers, who are required to provide “‘individualized counseling’” and to monitor their charges’ progress, Griffin v. Wisconsin, 483 U. S. 868, 876-877 (1987), and who are in a unique position to judge “how close a supervision the probationer requires,” id., at 876, may give rise to special needs justifying departures from Fourth Amendment strictures. See ibid. (“Although a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen”). But neither Knights nor Griffin supports a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, by law enforcement personnel who have no special interest in the welfare of the parolee or probationer.
What the Court sanctions today is an unprecedented curtailment of liberty. Combining faulty syllogism with circu *858 lar reasoning, the Court concludes that parolees have no more legitimate an expectation of privacy in their persons than do prisoners. However superficially appealing that parity in treatment may seem, it runs roughshod over our precedent. It also rests on an intuition that fares poorly under scrutiny. And once one acknowledges that parolees do have legitimate expectations of privacy beyond those of prisoners, our Fourth Amendment jurisprudence does not permit the conclusion, reached by the Court here for the first time, that a search supported by neither individualized suspicion nor “special needs” is nonetheless “reasonable.”
The suspicionless search is the very evil the Fourth Amendment was intended to stamp out. See Boyd v. United States, 116 U. S. 616, 625-630 (1886); see also, e. g., Indianapolis v. Edmond, 531 U. S. 32, 37 (2000). The preRevolutionary “writs of assistance,” which permitted roving searches for contraband, were reviled precisely because they “placed ‘the liberty of every man in the hands of every petty officer.’ ” Boyd, 116 U. S., at 625. While individualized suspicion “is not an ‘irreducible’ component of reasonableness” under the Fourth Amendment, Edmond, 531 U. S., at 37 (quoting United States v. Martinez-Fuerte, 428 U. S. 543, 561 (1976)), the requirement has been dispensed with only when programmatic searches were required to meet a “‘special need’ . . . divorced from the State’s general interest in law enforcement,” Ferguson v. Charleston, 532 U. S. 67, 79 (2001); see Edmond, 531 U. S., at 37; see also Griffin, 483 U. S., at 873 (“Although we usually require that a search be undertaken only pursuant to a warrant (and thus supported by probable cause, as the Constitution says warrants must be), ... we have permitted exceptions when ‘special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable’ ”).
Not surprisingly, the majority does not seek to justify the search of petitioner on “special needs” grounds. Although the Court has in the past relied on special needs to uphold *859 warrantless searches of probationers, id., at 873, 880, it has never gone so far as to hold that a probationer or parolee may be subjected to full search at the whim of any law enforcement officer he happens to encounter, whether or not the officer has reason to suspect him of wrongdoing. Griffin, after all, involved á search by a probation officer that was supported by reasonable suspicion. The special role of probation officers was critical to the analysis; “we deal with a situation,” the Court explained, “in which there is an ongoing supervisory relationship — and one that is not, or at least not entirely, adversarial — between the object of the search and the decisionmaker.” Id., at 879. The State’s interest or “special need,” as articulated in Griffin, was an interest in supervising the wayward probationer’s reintegration into society — not, or at least not principally, the general law enforcement goal of detecting crime, see ante, at 853.[1]
It is no accident, then, that when we later upheld the search of a probationer by a law enforcement officer (again, *860 based on reasonable suspicion), we forwent any reliance on the special needs doctrine. See Knights, 534 U. S. 112. Even if the supervisory relationship between a probation officer and her charge may properly be characterized as one giving rise to needs “divorced from the State’s general interest in law enforcement,” Ferguson, 532 U. S., at 79; but see id., at 79, n. 15, the relationship between an ordinary law enforcement officer and a probationer unknown to him may not. “None of our special needs precedents has sanctioned the routine inclusion of law enforcement, both in the design of the policy and in using arrests, either threatened or real, to implement the system designed for the special needs objectives.” Id., at 88 (Kennedy, J., concurring in judgment).
Ignoring just how “closely guarded” is that “category of constitutionally permissible suspicionless searches,” Chandler v. Miller, 520 U. S. 305, 309 (1997), the Court for the first time upholds an entirely suspicionless search unsupported by any special need. And it goes further: In special needs cases we have at least insisted upon programmatic safeguards designed to ensure evenhandedness in application; if individualized suspicion is to be jettisoned, it must be replaced with measures to protect against the state actor’s unfettered discretion. See, e. g., Delaware v. Prouse, 440 U. S. 648, 654-655 (1979) (where a special need “precludes insistence upon ‘some quantum of individualized suspicion,’ other safeguards are generally relied upon to assure that the individual’s reasonable expectation of privacy is not ‘subject to the discretion of the official in the field’ ” (quoting Camara v. Municipal Court of City and County of San Francisco, 387 U. S. 523, 532 (1967); footnote omitted)); United States v. Brignoni-Ponce, 422 U. S. 873, 882 (1975) (“[T]he reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government”). Here, by contrast, there are no policies in place — no “standards, guidelines, or procedures,” Prouse, 440 U. S., at 650 — to rein in officers and furnish a *861 bulwark against the arbitrary exercise of discretion that is the height of unreasonableness.
The Court is able to make this unprecedented move only by making another. Coupling the dubious holding of Hudson v. Palmer, 468 U. S. 517 (1984), with the bald statement that “parolees have fewer expectations of privacy than probationers,” ante, at 850, the Court two-steps its way through a faulty syllogism and, thus, avoids the application of Fourth Amendment principles altogether. The logic, apparently, is this: Prisoners have no legitimate expectation of privacy; parolees are like prisoners; therefore, parolees have no legitimate expectation of privacy. The conclusion is remarkablé not least because we have long embraced its opposite.[2] It also rests on false premises. First, it is simply not true that a parolee’s status, vis-a-vis either the State or the Constitution, is tantamount to that of a prisoner or even materially distinct from that of a probationer. See Morrissey v. Brewer, 408 U. S. 471, 482 (1972) (“Though the State properly subjects [a parolee] to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison”). A parolee, like a probationer, is set free in the world subject to restrictions intended to facilitate supervision and guard against antisocial behavior. As with probation, “the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements.” Pennsylvania Bd. of Probation and Parole v. Scott, 524 U. S. 357, 365 (1998). Certainly, parole differs from probation insofar as parole is “‘meted out in addition *862 to, not in lieu of, incarceration.’” Ante, at 850 (quoting United States v. Reyes, 283 F. 3d 446, 461 (CA2 2002)). And, certainly, parolees typically will have committed more serious crimes — ones warranting a prior term of imprisonment — than probationers. The latter distinction, perhaps, would support the conclusion that a State has a stronger interest in supervising parolees than it does in supervising probationers. But see United States v. Williams, 417 F. 3d 373, 376, n. 1 (CA3 2005) (“ ‘[TJhere is no constitutional difference between probation and parole for purposes of the [F]ourth [A]mendment’”). But why either distinction should result in refusal to acknowledge as legitimate, when harbored by parolees, the same expectation of privacy that probationers reasonably may harbor is beyond fathom.
In any event, the notion that a parolee legitimately expects only so much privacy as a prisoner is utterly without foundation. Hudson v. Palmer does stand for the proposition that “[a] right of privacy in traditional Fourth Amendment terms” is denied individuals who are incarcerated. 468 U. S., at 527. But this is because it “is necessary, as a practical matter, to accommodate a myriad of ‘institutional needs and objectives’ of prison facilities, . . . chief among which is internal security.” Id., at 524; see id., at 538 (O’Connor, J., concurring) (“I agree that the government’s compelling interest in prison safety, together with the necessarily ad hoc judgments required of prison officials, make prison cell searches and seizures appropriate for categorical treatment”[3]); see also Treasury Employees v. Von Raab, 489 U. S. 656, 680 (1989) (SCALIA, J., dissenting). These “institutional needs” — safety of inmates and guards, “internal order,” and sanitation, Hudson, 468 U. S., at 527-528 — mani *863 festly do not apply to parolees. As discussed above and in Griffin, other state interests may warrant certain intrusions into a parolee’s privacy, but Hudson’s rationale cannot be mapped blindly onto the situation with which we are presented in this case.
Nor is it enough, in deciding whether someone’s expectation of privacy is “legitimate,” to rely on the existence of the offending condition or the individual’s notice thereof. Cf. ante, at 852. The Court’s reasoning in this respect is entirely circular. The mere fact that a particular State refuses to acknowledge a parolee’s privacy interest cannot mean that a parolee in that State has no expectation of privacy that society is willing to recognize as legitimate — especially when the measure that invades privacy is both the subject of the Fourth Amendment challenge and a clear outlier. With only one or two arguable exceptions, neither the Federal Government nor any other State subjects parolees to searches of the kind to which petitioner was subjected. And the fact of notice hardly cures the circularity; the loss of a subjective expectation of privacy would play “no meaningful role” in analyzing the legitimacy of expectations, for example, “if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry.” Smith v. Maryland, 442 U. S. 735, 740-741, n. 5 (1979).[4]
*864 Threaded through the Court’s reasoning is the suggestion that deprivation of Fourth Amendment rights is part and parcel of any convict’s punishment. See ante, at 848-850.[5] If a person may be subject to random and suspicionless searches in prison, the Court seems to assume, then he cannot complain when he is subject to the same invasion outside of prison, so long as the State still can imprison him. Punishment, though, is not the basis on which Hudson was decided. (Indeed, it is settled that a prison inmate “ ‘retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.’” Turner v. Safley, 482 U. S. 78, 95 (1987).) Nor, to my knowledge, have we ever sanctioned the use of any search as a punitive measure. Instead, the question in every case must be whether the balance of legitimate expectations of privacy, on the one hand, and the State’s interests in conducting the relevant search, on the other, justifies dispensing with the warrant and probable-cause requirements that are otherwise dictated by the Fourth Amendment. That balance is not the same in prison as it is out. We held in Knights — without recourse to Hudson — that the balance favored allowing the State to conduct searches based on reasonable suspicion. Never before have we plunged below that floor absent a demonstration of “special needs.”
Had the State imposed as a condition of parole a requirement that petitioner submit to random searches by his parole officer, who is “supposed to have in mind the welfare of the *865 [parolee]” and guide the parolee’s transition back into society, Griffin, 483 U. S., at 876-877, the condition might have been justified either under the special needs doctrine or because at least part of the requisite “reasonable suspicion” is supplied in this context by the individual-specific knowledge gained through the supervisory relationship. See id., at 879 (emphasizing probation office’s ability to “assess probabilities in the light of its knowledge of [the probationer’s] life, character, and circumstances”). Likewise, this might have been a different ease had a court or parole board imposed the condition at issue based on specific knowledge of the individual’s criminal history and projected likelihood of reoffending, or if the State had had in place programmatic safeguards to ensure evenhandedness. See supra, at 860. Under either of those scenarios, the State would at least have gone some way toward averting the greatest mischief wrought by officials’ unfettered discretion. But the search condition here is imposed on all parolees — whatever the nature of their crimes, whatever their likelihood of recidivism, and whatever their supervisory needs — without any programmatic procedural protections.[6]
The Court seems to acknowledge that unreasonable searches “inflic[t] dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society.” Ante, at 856; see Terry v. Ohio, 392 U. S. 1, 19, 29 (1968). It is satisfied, however, that the *866 California courts’ prohibition against “ ‘arbitrary, capricious or harassing’ ” searches suffices to avert those harms — which are of course counterproductive to the State’s purported aim of rehabilitating former prisoners and reintegrating them into society. See ante, at 856 (citing People v. Reyes, 19 Cal. 4th 743, 968 P. 2d 445 (1998)). I am unpersuaded. The requirement of individualized suspicion, in all its iterations, is the shield the Framers selected to guard against the evils of arbitrary action, caprice, and harassment. To say that those evils may be averted without that shield is, I fear, to pay lipservice to the end while withdrawing the means.[7]
Respectfully, I dissent.

 As we observed in Ferguson v. Charleston, 532 U. S. 67 (2001), Griffin’s special needs rationale was east into doubt by our later decision in Skinner v. Railway Labor Executives’ Assn., 489 U. S. 602 (1989), which reserved the question whether “ ‘routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the .. . program,’ ” Ferguson, 532 U. S., at 79, n. 15 (quoting Skinner, 489 U. S., at 621, n. 5). But at least the State in Griffin could in good faith contend that its warrantless searches were supported by a special need conceptually distinct from law enforcement goals generally. Indeed, that a State’s interest in supervising its parolees and probationers to ensure their smooth reintegration may occasionally diverge from its general law enforcement aims is illustrated by this very case. Petitioner’s possession of a small amount of illegal drugs would not have been grounds for revocation of his parole. See Cal. Penal Code Ann. § 3063.1(a) (West Supp. 2006). Presumably, the California Legislature determined that it is unnecessary and perhaps even counterproductive, as a means of furthering the goals of the parole system, to reincarcerate former prisoners for simple possession. The general law enforcement interests the State espouses, by contrast, call for reineareeration.

 See Morrissey v. Brewer, 408 U. S. 471, 482 (1972) (“[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty”); Griffin v. Wisconsin, 483 U. S. 868, 875 (1987) (the “degree of impingement upon [a probationer’s] privacy ... is not unlimited”); see also Ferguson, 532 U. S., at 101 (Scalia, J., dissenting) (“I doubt whether Griffin’s reasonable expectation of privacy in his home was any less than petitioners’ reasonable expectation of privacy in their urine taken”).

 Particularly in view of Justice O’Connor’s concurrence, which emphasized the prison’s programmatic interests in conducting suspicionless searches, see Hudson, 468 U. S., at 538, Hudson is probably best understood as a “special needs” case — not as standing for the blanket proposition that prisoners have no Fourth Amendment rights.

 Likewise, the State’s argument that a California parolee “consents” to the suspicionless search condition is sophistry. Whether or not a prisoner can choose to remain in prison rather than be released on parole, cf. ante, at 852-853, n. 3, he has no “choice” concerning the search condition; he may either remain in prison, where he will be subjected to suspicionless searches, or he may exit prison and still be subject to suspicionless searches. Accordingly, “to speak of consent in this context is to resort to a ‘manifest fiction,’ for ‘the [parolee] who purportedly waives his rights by accepting such a condition has little genuine option to refuse.’” 5 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.10(b), pp. 440-441 (4th ed. 2004).

 This is a vestige of the long-discredited “act of grace” theory of parole. Compare Escoe v. Zerbst, 295 U. S. 490, 492-493 (1935) (“Probation or suspension of sentence comes as an act of grace to one convicted of a crime, and may be coupled with such conditions in respect of its duration as Congress may impose”), with Gagnon v. Scarpelli, 411 U. S. 778, 782, n. 4 (1973) (“[A] probationer can no longer be denied due process, in reliance on the dictum in Escoe v. Zerbst, that probation is an ‘act of grace’ ” (citation omitted)). See also Morrissey, 408 U. S., at 482.

 The Court devotes a good portion of its analysis to the recidivism rates among parolees in California. See ante, at 853-854. One might question whether those statistics, which postdate the California Supreme Court’s decision to allow the purportedly recidivism-reducing suspicionless searches at issue here, actually demonstrate that the State’s interest is being served by the searches. Cf. Reply Brief for Petitioner 10, and n. 10. Of course, one cannot deny that the interest itself is valid. That said, though, it has never been held sufficient to justify suspieionless searches. If high crime rates were grounds enough for disposing of Fourth Amendment protections, the Amendment long ago would have become a dead letter.

 As the Court observes, see ante, at 856, n. 5, under California law “an officer is entitled to conduct suspieionless searches only of persons known by him to be parolees.” Brief for United States as Amicus Curiae 20 (citing People v. Sanders, 31 Cal. 4th 318, 331-332, 73 P. 3d 496, 505 (2003)). It would necessarily be arbitrary, capricious, and harassing to conduct a suspicionless search of someone without knowledge of the status that renders that person, in the State’s judgment, susceptible to such an invasion.