

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-18-00223-CR

THE STATE OF TEXAS, APPELLANT

V.

FRANCISCO FERNANDO FERNANDEZ, APPELLEE

On Appeal from the 121st District Court
Terry County, Texas
Trial Court No. 7005, Honorable John A. Didway, Presiding

January 7, 2018

## OPINION

Before QUINN, C.J., and CAMPBELL and PARKER, JJ.

The State of Texas appeals from an order granting Francisco Fernando Fernandez's motion to suppress evidence. The underlying facts encompass a purported murder and the State's investigation of it. As part of the investigation, a local-police officer (Langehennig) stopped a pickup truck on rural Highway 380 outside Brownfield, Texas around 2:30 p.m. on July 4th. It held four occupants. The occupants were removed and taken to the police station. One of them was Francisco Fernando Fernandez. Fernandez was interrogated at the station after waiting in a room for many hours, which interrogation

was recorded.  Before it started, though, the interrogator (Chief Serbantez) neglected to read all the admonishments required by article 38.22, § 3(a)(2) of the Texas Code of Criminal Procedure to Fernandez.  Upon being arrested for the murder, Fernandez moved to suppress his statements to the police.  The trial court granted the motion.  The State appealed.  We affirm.

We review the decision to suppress evidence under the standard of abused discretion.  *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018).  Furthermore, that standard obligates us to sustain the decision if it is correct under any applicable theory of law and reverse it only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement."  *Id.*  If we must sustain the ruling on any applicable legal theory supporting it, then, logically, the State has the burden to establish that no applicable legal theory does.  *See John v. State*, No. 02-17-00372-CR, 2018 Tex. App. LEXIS 5533, at *4 (Tex. App.—Fort Worth July 19, 2018, no pet.) (mem. op., not designated for publication) (holding that because the applicable standard of review in a probation revocation appeal is abuse of discretion, "we cannot hold that a trial court's . . . decisions constitute an abuse of discretion when an appellant does not challenge all grounds on which the trial court based those decisions"); *accord Stringer v. Red River Commodities, Inc.*, No. 07-06-0119-CV, 2006 Tex. App. LEXIS 10617, at *3 (Tex. App.—Amarillo Dec. 13, 2006, no pet.) (mem. op.) (involving the standard of review of abused discretion in a civil appeal and holding that "the burden lies with appellant to show that there were no grounds supporting the decision").  That burden was not carried, as we now explain.

*Unaddressed Ground*

The State focused its argument on the legitimacy of the initial stop of the pickup truck in which Fernandez rode by Officer Langehennig. It argued that he had reasonable suspicion to do so. Yet, it said nothing about the extended nature of the initial stop and its legitimacy. *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (stating that the Fourth Amendment allows a policeman who lacks probable cause but whose observations lead him reasonably to suspect a particular person committed, is committing, or is about to commit a crime, to detain that person "briefly" to investigate the circumstances provoking that suspicion); *Pulver v. State*, No. 07-15-00112-CR, 2016 Tex. App. LEXIS 12412, at *7 (Tex. App.—Amarillo Nov. 17, 2016, pet. ref'd) (mem. op., not designated for publication) (involving a traffic stop and stating that a police officer may lawfully stop a vehicle and briefly detain its occupants for investigative purposes if, under the totality of the circumstances, the officer has reasonable suspicion a crime occurred but in the absence of reasonable suspicion that other criminal activity is afoot, the period of detention must be no longer than is reasonably necessary to effectuate the purposes of the initial stop). This omission is of import given it is one of the arguments mentioned by Fernandez in his motion to suppress and a legal conclusion of the trial court.

The argument to which we refer is the one proposing that "any statements made by him were obtained as the product of an ongoing illegal arrest and/or ongoing illegal detention." Fernandez continued this line of contention within his accompanying brief. There, he urged, among other things, that 1) "the [initial] detention of [Fernandez] was unlawfully extended beyond the initial purpose of the stop" and 2) "courts have held that

3

it is unreasonable for an officer to extend the duration of a traffic stop where the officer has failed to 'diligently pursue a means of investigation that was likely to confirm or dispel their suspicions quickly.'" The argument leads us to conclude that one of the applicable theories underlying the decision to grant Fernandez's motion pertained to the purportedly unlawful extension of the initial stop.[1] So, in failing to assign error to or address that ground underlying the trial court's decision, the appellate burden imposed on the State went unfulfilled.

To the extent one may suggest that the State's argument regarding attenuation ameliorates the aforementioned briefing omission, we say the following. The argument concerned "attenuation between that allegedly unlawful act by Officer Langehennig and the interview of Appellee which began nearly seven hours later." As can be seen, the State invokes attenuation as a means of rendering admissible the statements Fernandez uttered during his interrogation by Serbantez at the police station. It is not made in reference to any other purported statement. And, as we explain below, the trial court did

---

[1]It does not matter if the trial court failed to mention this ground in its amended findings of fact and conclusions of law as a basis for granting the motion to suppress. Our Court of Criminal Appeals explained in *Alford v. State*, 400 S.W.3d 924 (Tex. Crim. App. 2013), that a trial court's conclusions of law do not restrict the grounds upon which a decision regarding a motion to suppress may be affirmed. *See id.* at 929 (stating 1) "regardless of whether the trial court has made express conclusions of law, we uphold the trial court's ruling under any theory supported by the facts because an appellate court reviews conclusions of law de novo" and 2) "although the trial court made a conclusion of law denying appellant's motion to suppress under the community-caretaking exception to the warrant requirement, the appellate court was not limited to consideration of that legal theory and could uphold the trial court's ruling under any legal theory supported by the facts." Given that 1) Fernandez raised the issue about an undue extension of the investigatory detention, 2) the evidence of record illustrated that the stop resulted in Fernandez being "detained" for over seven hours before undergoing questioning, 3) Officer Langehennig indicated that he saw them commit a potential traffic violation involving the operation of the pickup truck in which Fernandez rode for driving at a high rate of speed, 4) the officers consistently said the detention was for investigatory purposes based on reasonable suspicion, 5) an investigatory detention must be "brief" and no longer than reasonably necessary, 6) the law enforcement officials offered no explanation for the seven-hour delay before questioning Fernandez for an additional three hours, and 7) the trial court did not expressly reject Fernandez's argument, the State was obligated to address it on appeal.

4

not abuse its discretion in suppressing those recorded statements irrespective of any attenuation between the initial stop and eventual interrogation.

*Defective Admonishment*

Per article 38.22, § 3(a), an oral statement of an accused from a custodial interrogation is inadmissible against the accused unless, among other things, "prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2" of article 38.22. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2) (West 2018). The warnings alluded to include what is commonly known as the *Miranda* warnings and one other. The other consists of informing the accused that he has the right to terminate the interview at any time. *Id.* art. 38.22, § 2(a)(5). That Fernandez was not provided the latter warning before his interrogation by Serbantez is unquestioned. Furthermore, the trial court issued findings of fact and conclusions of law holding that Fernandez was in custody at the time of the omission and the omission did not result in substantial compliance with the dictates of article 38.22(a). The State disagrees. In its view, appellant was not in custody. Alternatively, if he were in custody, the law enforcement officers nevertheless substantially complied with the statute, and substantial compliance was sufficient. We disagree with the State.

We mentioned the applicable standard of review earlier. In addition to what was said, we also note that it requires us to afford almost total deference to the trial court's factual determinations, especially those turning on the credibility and demeanor of a witness. *Cortez*, 543 S.W.3d at 203-04. Yet, such deference is not accorded the trial court's application of the law to the historical facts; we review those matters de novo. *Id.*

5

So too must we examine the evidence in a light most favorable to the trial court's ruling. *Wilson v. State*, 311 S.W.3d 452, 458 (Tex. Crim. App. 2010).

A similar standard applies when reviewing mixed questions of law and fact, such as when dealing with the topic of when someone is in the custody of law enforcement officials. *See State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013) (observing that the question of whether an accused was in custody is a mixed question of law and fact). Again, almost total deference is given to the trial court's assessments of historical fact and its conclusions with respect to mixed questions of law and fact that turn on credibility and demeanor. *Id.* On the other hand, our review is de novo when the mixed questions of law and fact do not turn on witness credibility and demeanor. *Id.*

Next, we must remember that a person is in custody only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Id.* at 496. There are at least four different situations that illustrate custody. They are 1) when the individual is physically deprived of his freedom of action in any significant way, 2) when a law enforcement official tells the person that he cannot leave, 3) when law enforcement official creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and 4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Id.* (quoting *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996)). Under the first three scenarios, the restriction on the person's freedom of movement must reach a degree associated with arrest, instead of a temporary or investigative detention. In the last scenario, not only must the law enforcement official's knowledge of probable cause be

6

manifested to the person, but the totality of the circumstances surrounding the interview must lead a reasonable person to believe he is under restraint to the degree associated with an arrest. *Id.*

As previously mentioned, the trial court expressly found that Fernandez was in custody when the police began interviewing him at the station. Our reading of the evidence offered at the suppression hearing in a light most favorable to the trial court's ruling illustrates that before the interview, Fernandez was one of four people in a white pickup truck stopped on the highway. Langehennig was investigating a murder and was informed about the possible sighting of a white single-cab pickup with three letters stenciled on its sides. After stopping or attempting to stop one or more other white pickups, the officer came upon the vehicle in which Fernandez rode. He made the stop around 2:30 p.m. Eventually, each of the four occupants were directed to exit the truck. By that time, at least three other police officers arrived, one of which was the police chief.

Langehennig could be heard telling those he stopped that the officers were investigating a murder, the truck occupants were being detained and transported to the police station, and the officers had "a lot of questions." The detainees were also told, three times, that they were "not allowed to leave." Langehennig took initial charge of Fernandez at the scene of the stop, directed him to the rear of a vehicle, and twice searched his charge for weapons. At that point, Fernandez asked if he was under arrest. Langehennig answered with "not at this time" but nevertheless made it clear that Fernandez was detained for questioning.

Serbantez eventually transported Fernandez to the station. As he did, he told Fernandez that he (Fernandez) needed to be cooperative. Defense counsel asked

7

Serbantez whether he merely solicited Fernandez's cooperation. To that, the chief indicated that his reference to cooperating was more of a directive. That is, the chief said: "I just — it wasn't a question. I think it was more, you know, cooperate with the officers." So, the trial court was entitled to reasonably interpret the response as meaning that Fernandez was not being asked if he would cooperate but, rather, being told to cooperate.

Upon their arrival at the station, Serbantez placed Fernandez in a room which may have been the office of one of the investigating officers. There Fernandez sat for approximately seven hours until being taken to another room for interrogation. At that point, the chief Mirandized Fernandez from a card given him by the local district attorney. Apparently missing from the card was the admonishment telling Fernandez he had the right to terminate the upcoming interview at any time. Once Mirandized in the deficient manner, Fernandez asked if he was under arrest. Refusing to answer the inquiry, Serbantez began his questioning. The chief conceded at the suppression hearing that his refusal to answer the question could be of concern to the interviewee. Nevertheless, the interrogation began, was recorded electronically, and lasted approximately three hours. Upon its completion, the officers returned Fernandez to the room wherein he initially sat. Eventually, an officer came to formally arrest him. The length of time between the interrogation's end and the formal arrest was not developed in the record.

Additionally, an officer testified that he "believe[d]" Fernandez was given food and "offered a bathroom break" at one point while at the station. When this purported offer of food and a "bathroom break" occurred is unclear. Whether it happened when Fernandez was initially taken to the station, sometime during his seven-hour stint while awaiting to be interrogated, or immediately before being taken to Serbantez for questioning cannot

8

be discerned from the evidence. Though, it does appear that Fernandez held a cup while being questioned by the chief.

The officers involved in the detention generally indicated that Fernandez would have been released had he asked. Yet, none told him that. More importantly, the trial court expressly concluded that "[a]ll statements of the officers that the occupants were free to go if they had requested is disbelieved and not credible evidence." This conclusion has evidentiary support given that Fernandez was told he was detained, could not leave, was going to be taken to the station and questioned, and was directed to cooperate. To this determination by the trial court, we add another. The trial court also deemed "not credible" Langehennig's reason for initially stopping the vehicle in which Fernandez rode. Together, the two conclusions gain additional significance. They reveal that the credibility and demeanor of the witnesses factored into the trial court's interpretation of the historical facts. Because their testimony at the hearing tended to contradict their actions at the scene and station, the trial court was obligated to decide what was true and what was not. Thus, the directives in *Saenz* obligate us to accord almost total deference to the trial court's conclusion whether Fernandez was in custody. Again, whether one is in custody implicates a mixed question of law and fact. When witness credibility and demeanor play a role in answering that question, our duty is to give almost total deference to the trial court's findings of fact and legal conclusions. *Saenz*, 411 S.W.3d at 494. And, we have no hesitancy in so deferring.

Again, law enforcement officials 1) stopped the vehicle in which Fernandez was a passenger on a rural two-lane highway, 2) told everyone to exit the vehicle, 3) told them they were detained and could not leave, 4) told them they were going to be questioned

9

about a murder, 5) told them that they were going to be taken to the police station to be asked those questions, and 6) actually separated and transported each person to the station. There was no invitation for them to meet there; they were told they were going and then taken there. At least two of the police present carried firearms, as depicted from the video of the scene. Once at the station, Fernandez was made to sit in a room for seven hours before any interrogation began. Never was he told he could leave if he so chose. Never was he merely asked if he would cooperate; he was told to cooperate by the head of the police department. Guns may not have been drawn, but the foregoing can certainly be considered a show of force by the officers.

After having sat in a room at the station for seven hours, Fernandez was taken by law enforcement to another room to sit for at least three more hours to undergo interrogation by the police chief. Once the interrogation ended, he was not told he could leave. Instead, he was made to sit within the station for another span of time while the police decided whether to formally arrest him.

The record before us is susceptible to being interpreted as a game of semantics played by those in control. Fernandez was not under arrest according to the officers, but he was removed from the pickup and frisked twice. He was not under arrest according to the officers, but he was told he could not leave. He was not under arrest according to the officers, but he had to go to the police station. He was not under arrest according to the officers, but he was directed to cooperate with them. He was not under arrest according to the officers, but he was never told he could leave. He was not under arrest according to the officers, but he had to sit for at least ten plus hours separated from the public in a police station. He was not under arrest according to the officers, but he

10

underwent three plus hours of questioning. For one not under arrest, Fernandez's freedom of choice and movement certainly was curtailed for a rather long time.

Of the four situations depicting custody in *Saenz* and other precedent, the evidence at bar establishes three, or so the trial court reasonably could have concluded. Fernandez was "physically deprived of his freedom of action in any significant way." Law enforcement official told him he could not leave. And, those same officials created a situation that would lead a reasonable person to believe that his freedom of movement was significantly restricted. The trial court correctly found that Fernandez was in custody when he underwent interrogation.

Because Fernandez was in custody, the officers were obligated by Texas statute to inform him of various rights to render his recorded statement admissible. As previously mentioned, one of those rights pertained to his ability to end the interview or interrogation at any time. He was not so admonished. Thus, article 38.22, § 3 of the Code of Criminal Procedure requires the suppression of his statement. Our legislature mandated strict compliance with said article when the statement is electronically recorded, as here. *Nonn v. State*, 41 S.W.3d 677, 679 (Tex. Crim. App. 2001) (*Nonn I*); *accord Flores v. State*, No. PD-1189-15, 2018 Tex. Crim. App. Unpub. LEXIS 398, at *16 (Tex. Crim. App. May 23, 2018) (not designated for publication) (noting that strict compliance with all portions of Section 3(a) is required); *see also Nonn v. State*, 117 S.W.3d 874, 879 (Tex. Crim. App. 2003) (*Nonn II*) (stating that "[t]his Court also noted that the portion of Article 38.22 pertaining to oral statements which are not electronically recorded, unlike the portion governing electronic recordings, does not contain an express legislative mandate of 'strict compliance.'"); TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(e) (stating that Texas courts

11

"shall strictly construe Subsection (a) of this section and may not interpret Subsection (a) as making admissible a statement unless all requirements of the subsection have been satisfied by the state, except that: (1) only voices that are material are identified; and (2) the accused was given the warning in Subsection (a) of Section 2 above or its fully effective equivalent"). Thus, neglecting to tell Fernandez that he may end the questioning at any time bars the use of any recorded statement he provided to the police while in custody. *Cruz v. State*, No. 04-05-00280-CR, 2007 Tex. App. LEXIS, at *7-8 (Tex. App.— San Antonio Mar. 7, 2007, no pet.) (mem. op., not designated for publication); *Hernandez v. State*, 13 S.W.3d 78, 82 (Tex. App.—Texarkana 2000, no pet.) (holding that the complete failure to tell the accused that he has the right to end the interview at any time is not substantial compliance and rendered the recording inadmissible).

To the extent that the State proposes that telling Fernandez "he could invoke his right to remain silent and not speak with the officers" was equivalent to telling him he could end the interview, it leaves us wondering why the legislature added the admonishment. Yet, binding rules of statutory construction obligate us to afford meaning to each provision and word of a statute. *See In re Office of the A.G.*, 422 S.W.3d 623, 629 (Tex. 2013) (orig. proceeding). If we were to conclude that merely telling the interviewee he could remain silent also meant he could end the interview, we would be violating the aforementioned rule of construction by rendering pointless the fifth admonishment in article 38.22, § 2(a)(5). That, we cannot do. Furthermore, telling a suspect he can end the interview at any time is nothing short of telling him he can stop the proceeding. If he can stop the proceeding (and unless the officers have legitimate basis to continue the detention), then he holds the keys to his immediate release. On the

other hand, merely telling the suspect that he may remain silent does not entitle him to leave. The officers may continue to ask questions and attempt to sway him to talk, as they have been known to do. And, the circumstances of this case illustrate that neither the chief nor his subordinates wanted Fernandez to leave. No, we must reject the State's proposition.

*Initial Detention*

The final issue we address involves the initial stop of the pickup truck carrying Fernandez. The State argues that Langehennig had reasonable suspicion to initially detain the vehicle and, therefore, Fernandez and its other occupants. We disagree.

Though inconsistent at times, Langehennig's testimony initially indicated that he stopped the pickup carrying Fernandez because it was traveling at a high rate of speed and "to make an investigative stop and see if there was anybody in there that we needed to speak to."[2] In so testifying, however, the officer did not mention the speed of the truck. Nor did he testify that its speed exceeded the posted limit of 75 mph, that he actually measured the truck's speed via some means, or that the vehicle was being operated in a manner dangerous to others. He merely opined that it travelled at a high rate of speed. Additionally, the State cited us to no statute making it a crime to operate a vehicle at a high rate of speed on roads permitting travel at a high rate of speed like 75 mph.

No doubt, an officer may make a warrantless traffic stop if he has "specific, articulable facts" that, when combined with rational inferences therefrom, would lead him to reasonably suspect that a particular person has engaged, is engaging, or soon will engage in criminal activity. *Cortez*, 543 S.W.3d at 204. In other words, the officer must

---

[2] By then, he had already stopped and released a different single-cab white pickup within the city of Brownfield to see if it carried anyone with whom the police needed to speak.

13

have before him specific, articulable facts reasonably suggesting that crime is afoot. While investigating crime, he cannot simply stop any vehicle to see if it contains anyone with whom he needs to speak. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) (stating that a search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing).

As for what constitutes such facts, the debate will rage on. But, it is clear that "[m]ere opinions are ineffective substitutes for specific, articulable facts in a reasonable-suspicion analysis." *Ford v. State*, 158 S.W.3d 488, 494 (Tex. Crim. App. 2005) (wherein officer Peavey sought to justify the stop by simply testifying that Ford was "following too close" to another vehicle). Without "objective factual support" underlying the opinion, it is insufficient to legitimize the stop. *Id.* at 494. Langehennig's statement at bar that the pickup was "traveling at a high rate of speed" is no less of a conclusory opinion than that of Peavey in *Ford.* Like Peavey's, the opinion of Langehennig also was bereft of objective factual support. So, like Peavey's, that of Langehennig also is insufficient to legitimize the stop here.

Nonetheless, it appears that Langehennig eventually uttered one other basis for stopping Fernandez. It concerns his testimony that the truck in which Fernandez was a passenger matched the description of a vehicle in which a "person of interest" was seen entering. The person of interest was a female named Herrera. They came upon her name via comments from another female named Fisher during the morning of July 4th but after 9:00 a.m. Fisher told them that Herrera and a Hispanic male had come to her (Fisher's) house earlier that morning, around 4:00 a.m.[3] Herrera allegedly told Fisher that

---

[3] The Hispanic male was not Fernandez.

she (Herrera) had attempted to buy drugs from the murder victim (Roadie) at some time or another prior to 4:00 a.m. Herrera apparently knocked on the victim's door and encountered no response; so, she left. Fisher then added that once Herrera finished her story, she and the Hispanic male left in a silver truck later determined to be Fernandez's. This information led Langehennig to begin his July 4th afternoon search for Herrera. He conceded under examination that he had no information indicating she was materially involved in the decedent's murder. Instead, he sought her because Fisher said they "were somehow involved and that I need to speak to them."

When Langehennig began his search, he also had information that 1) Herrera had entered a "white truck" or "white pickup" and 2) this generic white vehicle left in a northerly direction on Highway 62 / 82. The record fails to reveal the actual time when Herrera was seen doing that or when the pickup headed north. Nor does it reveal if it occurred before or after 9:00 a.m., which was the approximate time the officers began their investigation of Roadie's death. One can infer, though, that it happened sometime within the ten-and-a-half-hour period between Herrera first contacting Fisher at 4 a.m. and Langehennig effectuating the 2:30 p.m. traffic-stop in question here.

So, Langehennig decided to search for and stop "single cab" white pickup trucks. His decision initially led him to stop such a vehicle only to find that neither of its occupants were people with whom he cared to speak. They were released, and Langehennig resumed his search for a white truck.

Despite having information that the vehicle he sought left in a northerly heading on Highway 62 / 82, the officer opted to sojourn in a westerly direction down Highway 380, which highway led from Brownfield to Plains, Texas. His decision to do so was apparently

15

influenced by information he had received about either or both Herrera and Fernandez being from Plains. After driving west for some distance and passing a white pickup heading east on Highway 380, Langehennig reversed course and drove back towards Brownfield. He would eventually assert that by that time a fellow officer (Coronado) had told him that the white truck had "'TRO' on the back of it." Who purportedly told that to Coronado is unknown; Langehennig would come to testify that he guessed it was Fisher. Yet, Coronado never testified that the vehicle had such lettering; instead, he merely described it as a generic "white truck." Garnering this information, though, supposedly led Langehennig to surmise that "'TRD' is often printed on the back of Toyota pickups, meaning Toyota Racing Development."

Upon reversing course and driving back towards Brownfield, Langehennig encountered another white pickup. The latter can be seen approaching him on the video from his dash camera. So too does the video illustrate that while the approaching vehicle remained in the distance, Langehennig decided to pursue it by pulling onto the right shoulder of the highway in preparation for a turn. Once it passed, he gave chase and soon stopped the truck.

The officer recognized none of the occupants before stopping the vehicle. Nevertheless, he soon discovered that Anthony Serbantez, the police chief's son, was driving it. Furthermore, the pickup was white and displayed "TRD" on the side of its bed. Yet, as the trial court expressly found and the video illustrated, it was not a single-cab truck but rather an "extended cab" having two rows of seats and four doors. This deviation

from the actual description of the single cab pickup Langehennig initially sought was of concern to the trial court, as evinced by one of its fact findings.[4]

Other aspects of Langehennig's testimony were also of concern to the court. For instance, it expressed in its findings of fact that 1) Langehennig's "reason for the stop of travelling at a high rate of speed [was] not credible"; 2) Langehennig also "gave contradicting testimony," as depicted a) when "[f]irst he states on direct that he stopped the vehicle for traveling at a high rate of speed, but then . . . testifie[d] he stopped the truck to make an investigative stop" and b) "he tells the occupants they are detained, not free to leave, they are held for questioning and 'you ain't leaving' . . . [while] [t]hen on the stand under oath the Officer states [Ferndandez] would have been free to go if he had asked." After expressing these observations, the trial court decided that 1) "[t]he officer for the second time, guessed and stopped a white pickup" and 2) "there was no reasonable suspicion to stop" Serbantez's truck.

These findings implicate Langehennig's credibility. They also evince the trial court's attempt to deal with issues surrounding his credibility when deciding how to rule upon the motion to suppress. That is, the existence of reasonable suspicion is a mixed question of law and fact. *State v. Kerwick,* 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). So, resolution of the legal prong is influenced by what the trial court determines the historical facts to be. In turn, the credibility of the evidence and witnesses providing it influence the decision as to what those historical facts are. So, woven within the fabric of the trial court's legal ruling here are the aforementioned threads of concern about Langehennig's credibility. It cannot be denied that the trial court's ultimate decision

---

[4] It found that "[a]lthough it was white with TRO on the side, it was not a single cab as reported."

17

depended upon how it disposed of the credibility question. Because of that, the pertinent standard of review obligates us to afford almost total deference to the trial court's ruling on the mixed question of law and fact. *Id.*; *Saenz, 411 S.W.3d at 494.* And, we find little basis to deny that ruling the deference due it given Langehennig's contradictions.

One other matter also sways us against withholding deference. It concerns the rather generic description of the "white truck" guiding Langehennig's search. Pickups are rather common within West Texas. They are quite common in Brownfield, Texas, as well. The video of Langehennig's search for the "white truck" proves as much. It is rife with images of such trucks. This leads us to conclude that a "white truck" displaying "TRO" is too general of a description to justify the detention of all trucks which may match that description in part. Again, a search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. *City of Indianapolis v. Edmond*, 531 U.S. at 37. That means specific, articulable facts must tie the particular person or vehicle to wrongdoing. Generic descriptions can fall short of that. *See,* e.g., *United States v. Martinez*, No. 17-4131, 2018 U.S. App. LEXIS 35373, at *14 (10th Cir. Dec. 18, 2018) (stating that general descriptions are relevant to the reasonable-suspicion inquiry but insufficient themselves to support a finding of reasonable suspicion); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 733-37 (5th Cir. 2000) (involving a "BOLO ('be on the look out') for a white male, approximately six feet tall, heavy-set, and dressed like a cowboy, possibly heading to a cowboy bar" and holding that description insufficient to give officers reasonable suspicion to stop and frisk any tall, heavy-set, white man since it was too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion); *United States v. Rias*, 524 F.2d 118, 119-21 (5th Cir. 1975)

18

(involving a description consisting of "two black males in a black or blue Chevrolet" and holding that it was insufficient to justify the later detention of two black males riding in a Chevy). No one testified that pickup trucks with "TRO" or "TRD" written on them are an uncommon site. No one testified that white trucks with "TRO" are uncommon or unique. No one testified about the time span between Herrera being seen boarding a white pickup displaying "TRO" and Langehennig stopping the Serbantez truck. No one testified about the geographic distance between the location at which Herrera was seen entering the truck and the place Langehennig stopped Serbantez. Here, the mere description of a "single cab" "white truck" with "TRO" on the back last seen heading north on a major highway at some unknown point in time is too generic a description to create reasonable suspicion justifying the detention of westbound white trucks that partially matched the description.

We overrule the State's issues and affirm the trial court's order granting the motion to suppress.

Brian Quinn<br>Chief Justice

Publish.