

FILED

Oct 30 2019, 8:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR
APPELLANT/CROSS APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR
APPELLEE/CROSS APPELLANT

Stephen Gerald Gray
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant/Cross Appellee-Plaintiff,*

v.

Tyree L. Harper,

*Appellee/Cross Appellant-Defendant.*

October 30, 2019

Court of Appeals Case No.
18A-CR-2811

Appeal from the Marion Superior Court

The Honorable Shatrese Flowers, Judge

Trial Court Cause No.
49G20-1606-F2-25117

**Pyle, Judge.**

## Statement of the Case

[1] The State of Indiana appeals the trial court's grant of Tyree Harper's ("Harper") motion to suppress. On cross-appeal, Harper asserts that the trial court erred by denying his motion to discharge pursuant to Indiana Criminal Rule 4(C). Concluding that the trial court erred by granting Harper's motion to suppress, we reverse and remand for further proceedings. In addition, we affirm the trial court's denial of Harper's motion to discharge.

[2] We affirm in part, reverse in part, and remand for further proceedings.

## Issues

1. Whether the trial court erred by granting Harper's motion to suppress.

2. Whether the trial court erred by denying Harper's motion to discharge under Criminal Rule 4(C).

## Facts

[3] In September 2015, Harper was placed on parole following a conviction for possession of a firearm by a serious violent felon, and he signed a Conditional Parole Release Agreement ("parole agreement"). Under paragraph 9, titled, "HOME VISITATION AND SEARCH," the parole agreement provided that:

> I understand that I am legally in the custody of the Department of Correction and that my person and residence or property under my control may be subjected to reasonable search by my supervising officer, or authorized official of the Department of Correction if the officer or official has reasonable cause to believe

the parolee is violating or is in imminent danger of violating a condition to remaining on parole.

(State's Ex. 4). The parole agreement also provided that the use, possession, or trafficking illegally of a controlled substance and out-of-state travel without permission were parole violations.

[4] On June 16, 2016, Harper's parole officer, Josh Jellison ("Parole Officer Jellison"), received information from an anonymous source that Harper was traveling to New York and dealing narcotics in Indianapolis. The complaining party also stated that Harper had rented a storage unit on Mitthoeffer Road. Four days later, Parole Officer Jellison called Harper in for a parole meeting and administered a drug test wherein Harper tested positive for cocaine. During this meeting, Harper also admitted to traveling to New York without permission. Harper's positive drug test and admission to traveling out of the state were both violations of parole. Harper was arrested for the violations and taken into custody at the parole office.

[5] Parole Officer Jellison and Harper then went to Harper's home, and Parole Officer Jellison conducted a warrantless search. During the search, Parole Officer Jellison located a receipt, which was in Harper's name, for a storage unit at 2425 North Mitthoeffer Road. Parole Officer Jellison went to the storage unit with Harper and unlocked the unit with one of Harper's keys. Inside the storage unit, in plain view, Parole Officer Jellison observed a black handgun and a large, clear Ziploc bag containing a block of white substance.

Parole Officer Jellison immediately stopped this initial search of the storage unit and advised an IMPD officer present of what he had observed.

[6] After obtaining a search warrant, the police seized the gun and white powder block during their subsequent search of the storage unit. They also seized another plastic bag with a white powdery substance, pills, and other materials consistent with drug trafficking. A laboratory analysis disclosed that the storage unit contained two batches of cocaine weighing 558.1 grams and 254.79 grams and twelve fake .12-gram oxycodone pills containing heroin. Harper was then transported to the custody of the Department of Correction ("DOC").

[7] On June 29, 2016, the State charged Harper with Level 2 felony dealing in cocaine in ten (10) or more grams, Level 3 felony possession of cocaine in twenty-eight (28) or more grams, and Level 4 felony unlawful possession of a firearm by a serious violent felon. According to the Chronological Case Summary ("CCS"), an arrest warrant was issued and then recalled on June 30, 2016. The CCS further shows that an arrest warrant was again issued on June 30, 2016 and served over a year later, on August 16, 2017, when Harper was released from the DOC.

[8] On April 10, 2018, Harper filed two motions in the trial court. First, Harper filed a motion to suppress the evidence, arguing that the initial warrantless search of the storage unit "exceeded the bounds of a proper 'parole search' and was, in fact, an 'investigatory search' intended to discover evidence of new criminal activity." (App. 47). He argued that, as a result, the evidence seized

pursuant to the search warrant during the subsequent search should be suppressed as fruit of the poisonous tree. Next, Harper filed a motion for discharge under Criminal Rule 4(C). Harper argued that he had "not been brought to trial within one (1) year of his arrest or the date that charges were filed." (App. 51).

[9] The trial court held a hearing on both motions on May 22, 2018. The trial court granted Harper's motion to suppress and denied his motion for discharge. In regards to the motion to suppress, the trial court found that the search of Harper's person and residence were lawfully conducted by Parole Officer Jellison but that the initial search of Harper's storage unit required a search warrant and violated the Fourth Amendment to the U.S. Constitution and Article 1, Section 11 of the Indiana Constitution. The State now appeals.

# Decision

[10] The State argues that the trial court erred when it granted Harper's motion to suppress. Harper, as the cross-appellant, asserts that the trial court erred by denying his motion to discharge pursuant to Indiana Criminal Rule 4(C). We will address each issue in turn.

## 1. Motion to Suppress

[11]     The State appeals following the trial court's grant of Harper's motion to suppress, which effectively terminated the prosecution of this case.[1]  Because the State appeals from a negative judgment, it bears the burden to show that the trial court's ruling was contrary to law.  *State v. Brown*, 70 N.E.3d 331, 335 (Ind. 2017).  When reviewing a trial court's suppression ruling, we determine whether the record contains substantial evidence of probative value that supports the trial court's decision.  *Id*.  "We evaluate the trial court's findings of fact deferentially, neither reweighing the evidence nor reassessing the credibility of the witness."  *Id*.  However, we review the trial court's conclusions of law *de novo*.  *Id*.

[12]     The State argues that a warrant was not required for the initial search of the storage unit and that the initial search was permitted pursuant to a valid search condition in the parole agreement.

[13]     Generally, searches should be conducted pursuant to a warrant supported by probable cause.  *Allen v. State*, 743 N.E.2d 1222, 1227 (Ind. Ct. App. 2011), *reh'g denied*, *trans. denied*.  "However, the United States Supreme Court has determined that '[a] State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the

---

[1] We have authority to review an order granting a motion to suppress if the ultimate effect of the order is to preclude further prosecution.  IND. CODE § 35-38-4-2(5).

usual warrant and probable-cause requirements.'" *Id*. (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987)).

[14] There are two methods for analyzing parole or probation searches under the Fourth Amendment. *State v. Schlechty*, 926 N.E.2d 1, 5 (Ind. 2010). The first is the "special needs" exception outlined in *Griffin*; the second is a balancing test which weighs the totality of the circumstances outlined in *United States v. Knights*, 534 U.S. 112 (2001). *Schlechty,* 926 N.E.2d at 5.

[15] Concerning the "special needs" exception, a warrantless probation search under *Griffin* "may be justified on the basis of reasonable suspicion to believe a probation violation has occurred because, among other things, supervision of probationers is necessary to ensure that probation restrictions are in fact observed, and that the community is not harmed by the probationer being at large." *Id*. at 6. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, but it still requires at least a minimal level of objective justification and more than an inchoate and unparticularized suspicion or "hunch" of criminal activity. *Id*. at 7 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)). Accordingly, "[t]his court has held that a probationer is entitled to limited protection of his privacy interests." *Allen*, 743 N.E.2d at 1227. "[A]ffording probationers lesser protections is predicated on the premise that probation officers, or police working with probation officers, are conducting searches connected to the enforcement of conditions of probation and not for normal law enforcement purposes." *Id*. at 1227-28 (quoting *Polk v. State*, 739

N.E.2d 666, 669 (Ind. Ct. App. 2000)). When a search is not conducted within the regulatory scheme of probation enforcement, a probationer's normal privacy rights cannot be stripped from him. *Id*. at 1228. The State must demonstrate that a warrantless search of a probationer was a true probationary search and not an investigatory search. *Micheau v. State*, 893 N.E.2d 1053, 1059 (Ind. Ct. App. 2008), *trans. denied*. A probation search cannot be a mere subterfuge enabling the police to avoid obtaining a search warrant. *Id*. We apply this same analysis to parolees. *See State v. Vanderkolk*, 32 N.E.3d 775, 779 (Ind. 2015) ("[T]he similarities between parole and probation (or community corrections) are far greater than the differences."); *Allen*, 743 N.E.2d at 1228 n.8 (the procedures concerning searches of probationers apply equally to parolees).

[16] Turning to the balancing test outlined in *Knights*, we need not examine the motivation of parole officers to determine whether a search was a parole or probationary search or a normal investigatory search. In *Knights*, the United States Supreme Court held, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Knights*, 534 U.S. at 121.

[17] In that case, Mark James Knights ("Knights") was placed on probation in California for a drug offense. As a condition of his probation, he agreed to submit to a search of his personal or real property at any time, with or without a warrant or reasonable cause. Several days after beginning probation, law

enforcement suspected Knights was involved in a fire that caused significant damage to a "Pacific Gas & Electric ("PG & E") transformer and adjacent Pacific Bell telecommunications vault near the Napa County Airport . . . ." *Id.* at 114. Brass padlocks were found at the scene, and this incident was the latest in a string of thirty incidents that had focused suspicion on Knights and Simoneau, another suspect, after the utility had filed a theft-of-services complaint and disconnected Knights' utility services for failure to pay his bill. "Detective Todd Hancock of the Napa County Sheriff's Department had noticed that the acts of vandalism coincided with Knights' court appearance dates concerning theft of services." *Id.* at 115. And just a week before the arson, a sheriff's deputy had stopped Knights and Simoneau near a PG & E gas line and observed pipes and gasoline in Simoneau's pickup truck. During additional surveillance of Knights' apartment, deputies observed Simoneau leaving with three cylindrical items believed to be pipe bombs; he later returned without those items. Knowing of the search conditions in Knights' probation order, detectives conducted a warrantless search of Knights' apartment. "The search revealed a detonation cord, ammunition, liquid chemicals, instruction manuals on chemistry and electrical circuitry, bolt cutters, telephone pole-climbing spurs, drug paraphernalia, and a brass padlock stamped 'PG & E.'" *Id.* Knights was arrested and indicted. After filing a motion to suppress the evidence collected from the search of his apartment, the District Court granted the motion "on the ground that the search was for 'investigatory' rather than 'probationary' purposes." *Id.* at 116. The Court of Appeals for the Ninth Circuit affirmed, and the Supreme Court granted certiorari.

[18]     Reversing the Ninth Circuit Court of Appeals, the Supreme Court determined that the "special needs" exception to the Fourth Amendment warrant requirement is not limited to searches only like those in *Griffin*. *Id*. at 117. The Court explained its reasoning as follows:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Knights' status as a probationer subject to a search condition informs both sides of that balance. "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.'" Probation is "one point … on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'" Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.
>
> The judge who sentenced Knights to probation determined that it was necessary to condition the probation on Knights' acceptance of the search provision. It was reasonable to conclude that the search condition would further the two primary goals of probation-rehabilitation and protecting society from future criminal violations. The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition significantly diminished Knights' reasonable expectation of privacy.
>
> In assessing the governmental interest side of the balance, it must be remembered that "the very assumption of the institution of probation" is that the probationer "is more likely than the ordinary citizen to violate the law." The recidivism rate of probationers is significantly higher than the general crime rate. And probationers have even more of an incentive to conceal their

criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply, . . . .

The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. The view of the Court of Appeals in this case would require the State to shut its eyes to the latter concern and concentrate only on the former. But we hold that the Fourth Amendment does not put the State to such a choice. Its interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.

We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interest is reasonable.

The same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary.

> Because our holding rests on ordinary Fourth Amendment
> analysis that considers all the circumstances of a search, there is
> no basis for examining official purpose. With the limited
> exception of some special needs and administrative search cases,
> *see Indianapolis v. Edmond*, 531 U.S. 32, 45, 121 S.Ct. 447, 148
> L.Ed.2d 333 (2000), "we have been unwilling to entertain Fourth
> Amendment challenges based on the actual motivations of
> individual officers."

*Id*. at 118-122 (citations and footnotes omitted).

[19] Since *Knights*, the United States Supreme Court has also held that parolees may have an even lesser expectation of privacy than probationers "because parole is more akin to imprisonment than probation is to imprisonment." *Samson v. California*, 547 U.S. 843, 850 (2006). However, the Indiana Supreme Court has chosen not to adopt a hierarchy of persons on supervised release who receive greater privacy protections. Our Supreme Court ably noted that "the similarities between parole and probation (or community corrections) are far greater than the differences." *Vanderkolk*, 32 N.E.2d at 779. Nevertheless, Indiana parolees, probationers, and community corrections participants, who have consented or been clearly informed that the conditions of their release "unambiguously authorize warrantless and suspicionless searches, may thereafter be subject to such searches during the period of their" supervised release. *Id.*

[20] In analyzing the facts of this case, we choose to adopt the *Knights* approach in resolving the search issue. Here, Harper was placed on parole following a conviction for possession of a firearm by a serious violent felon. His parole agreement allowed a supervising parole officer or an authorized DOC official to

perform a "reasonable search" of "property under [Harper's] control," if they had "reasonable cause to believe that the parolee is violating or is in imminent danger of violating a condition to remaining on parole." (State's Ex. 4). The record reveals that Parole Officer Jellison received a tip that Harper was traveling to New York and dealing narcotics in Indianapolis. Parole Officer Jellison scheduled a parole visit for Harper at his office. During this visit, Harper failed a drug test indicating narcotics use and admitted to traveling out-of-state without permission, both of which were violations of Harper's parole. Immediately thereafter, Parole Officer Jellison completed a parole search of Harper's residence, which yielded a receipt for a storage unit rented in Harper's name. Parole Officer Jellison and Harper then went to the storage unit, which contained property under Harper's control, and unlocked the unit with one of Harper's keys. In plain view, Parole Officer Jellison observed a black handgun and a large, clear Ziploc bag containing a block of white substance, which he suspected to be cocaine. Parole Officer Jellison immediately stopped the search and advised an IMPD officer present of what he had observed. Law enforcement then obtained a warrant for the subsequent search of Harper's storage unit.

[21] Based on the totality of the circumstances in this case, we find that the parole and law enforcement officers had reasonable suspicion to believe that Harper, who had actual knowledge of the search terms of his parole conditions, was engaged in criminal activity. Because the search at issue was predicated on the

parole conditions and reasonable suspicion, we reverse the trial court's grant of Harper's motion to suppress and remand for further proceedings.

## 2. Indiana Criminal Rule 4(C)

[22] Harper argues that the trial court erred by denying his motion for discharge pursuant to Indiana Criminal Rule 4(C), which provides in relevant part:

> No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar[.] . . . Any defendant so held shall, on motion, be discharged.

Thus, under Criminal Rule 4(C), a defendant may seek and be granted a discharge if he is not brought to trial within the proper time period. *State v. Delph*, 875 N.E.2d 416, 419 (Ind. Ct. App. 2007), *reh'g denied*, *trans. denied*. In reviewing Criminal Rule 4 claims, we review questions of law *de novo*, and we review factual findings under the clearly erroneous standard. *Austin v. State*, 997 N.E.2d 1027, 1039-40 (Ind. 2013).

[23] The purpose of Indiana Criminal Rule 4(C) is to promote early trials, not to discharge defendants. *Fuller v. State*, 995 N.E.2d 661, 665 (Ind. Ct. App. 2013), *trans. denied*. Subject to the exceptions listed in Rule 4(C), the State has an affirmative duty to bring the defendant to trial within one year of being charged or arrested. *Wood v. State*, 999 N.E.2d 1054, 1060 (Ind. Ct. App. 2013), *trans.*

*denied*, *cert. denied*. The defendant is neither obligated to remind the court of the State's duty nor is required to take affirmative steps to ensure that he is brought to trial within the statutory time period. *Id*. At the same time, Criminal Rule 4 is not intended to be a mechanism for providing defendants a technical means to escape prosecution. *Austin*, 997 N.E.2d at 1037. When a defendant moves for discharge, he bears the burden of showing that he has not been timely brought to trial and that he is not responsible for the delay. *Wood*, 999 N.E.2d at 1060.

[24] Harper maintains that the Rule 4(C) clock should have begun to run on June 30, 2016, while he was incarcerated for his parole violation. In support of his position, Harper relies on *Rust v. State*, 792 N.E.2d 616 (Ind. Ct. App. 2003), *trans. vacated*, in which this court reversed the denial of a motion for discharge. There, our Court concluded that the Criminal Rule 4(C) clock was tolled when the defendant failed to appear for hearings but restarted once the trial court and State were notified of the defendant's incarceration in another county. *Id*. at 620.

[25] Harper contends that *Rust* is similar to the facts here because "the State knew all along where Harper was incarcerated because he was in State custody the whole time and the principal witness in this case, Parole Officer Jellison[,] is the very person who took him back into the custody of the DOC." (Harper's Br. 22). Harper points to a copy of an email communication between two Marion County Sheriff's Department employees on June 30, 2016. The email contains a warrant issued by the trial court, details Harper's location, and requests that a

detainer be placed on Harper for the "Marion Co. Sheriff Office." (Harper's Exhibit B). The email also contains what purports to be a handwritten notation that the warrant was "[s]erved 6-30-16." (Harper's Exhibit B).

[26] However, under the facts of this case, we cannot agree with Harper's contention that the Criminal Rule 4(C) clock should have begun to run on June 30, 2016. Here, Harper was incarcerated as a parole violator on June 20, 2016 until August 16, 2017. The information for the instant case was filed on June 29, 2016; however, the CCS, which is the official record of the trial court, indicates that he was not served with the arrest warrant until August 16, 2017. *See* Ind. Trial Rule 77(B). Criminal Rule 4(C) provides that the one-year time period begins "from the date the criminal charge against such defendant is filed or from the date of his arrest on such charge, whichever is later[.]" Harper was not held under this case until he was served with the arrest warrant in August 16, 2017. As a result, we conclude that the trial court properly denied Harper's motion to discharge in accordance with Criminal Rule 4(C).

[27] Affirmed in part, reversed in part, and remanded for further proceedings.

Robb, J., and Mathias, J., concur.